1
2
3
4
5
6
7

**Todd M. Friedman (216752)**
**Adrian R. Bacon (280332)**
**Law Offices of Todd M. Friedman, P.C.**
**21550 Oxnard St., Suite 780**
**Woodland Hills, CA 91367**
**Phone: 323-306-4234**
**Fax: 866-633-0228**
**tfriedman@toddflaw.com**
**abacon@toddflaw.com**
*Attorneys for Plaintiff, JOHN PARZIALE and all others similarly situated*

8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10
11
12

JOHN PARZIALE, individually, and
on behalf of all others similarly
situated,

13

Plaintiff,

14

vs.

15

HP, INC. and DOES 1-10,

16

Defendant(s).

Case No. 5:19-cv-05363-EJD

**SECOND AMENDED CLASS
ACTION COMPLAINT**

(1)   Violation of Florida Deceptive and
Unfair Trade Practices Act (F.S.A.
§§ 501.201 *et seq*.) and
(2)   Violation of Computer Fraud and
Abuse Act, 18 U.S.C. § 1030, *et
seq.* (CFAA);
(3)   Trespass to Chattels

17
18
19
20
21

**Jury Trial Demanded**

22
23
24
25
26
27
28

Plaintiff JOHN PARZIALE ("Plaintiff"), individually and on behalf of all other members of the public similarly situated, allege as follows:

## NATURE OF THE ACTION

1.     Plaintiff brings this class action Complaint against Defendant HP, INC. (hereinafter "Defendant") to stop Defendant's practice of modifying and corrupting Purchasers' printers by forcing unauthorized changes to their firmware and to obtain redress for all Purchasers Nationwide ("Class Members") who, within the applicable statute of limitations period, had their HP Printers modified to stop recognizing and accepting third party ink cartridges.

2.     Defendant is a Delaware corporation with its principal place of business and headquarters in California and is engaged in the design, development, manufacture, sale, and distribution of printers and related equipment and services throughout the world with a large share of its business done in California.

3.     On or around April 12, 2019, thousands of HP Printer owners in the United States and other countries started experiencing problems and crashes with their HP Printers, since said printers stopped recognizing and accepting third party ink cartridges (i.e. ink cartridges which had not been manufactured by HP, Inc. but were compatible with the HP Printers before April 12, 2019.

4.     In an effort to dominate the ink cartridge marketplace, HP designed, developed, wrote and distributed a firmware[1] update for HP Printers, including HP Printers owned by Plaintiff and other members of the class.

5.     HP forced firmware modifications to the HP Printers which were specifically designed and programmed to reject, starting on April 12, 2019, all

---

[1] "Firmware" is generally defined as a software program installed into a hardware device. Firmware provides the necessary instructions for how the device operates and communicates with other computer hardware.

third party ink cartridges, including any said third party ink cartridge which had already been purchased and installed by Class Members and which were already properly working in their HP Printers.

6.     The Class Members were not informed by HP of this plan to program a rejection of third party ink cartridges, either at the time they purchased their printers from HP or at any time prior to HP's unannounced updates to their firmware.  HP's goal was to disable the HP Printers after their sale to Class Members, unless and until only new HP brand ink cartridges were installed, which cost approximately twice as much, in order for HP to greatly increase its profits to the detriment of Class Members.

7.     Plaintiff and similarly situated Purchasers purchased printers that were represented as having certain features and capacities.

8.     Plaintiff and similarly situated Purchasers relied on these representations on the face of the packaging when purchasing their printers.

9.     When purchasing these printers, Plaintiff and similarly situated Purchasers desired and believed to have obtained printers with the capacity to use third party ink cartridges.

10.     Plaintiff and similarly situated purchasers were not told at the time of purchase that their HP Printer would in the future reject the less expensive third party ink cartridges.

11.     Furthermore, Plaintiff and similarly situated Purchasers were not informed by HP of the modifications in question and did not consent to HP unilaterally pushing such modifications into their HP Printer, rendering the printers unable to make, use, copy, scan, fax, or print documents, photographs, or other printable items and making the printers no longer what Plaintiff and similarly situated Purchasers had bargained for.

12.     For these reasons and others, Plaintiff brings this class action

complaint on behalf of himself and individuals similarly situated against Defendant for its illegal, unfair, and unconscionable actions in violating the privacy rights of hundreds of thousands of individuals nationwide in order to obtain an unfair and illegal competitive advantage.

## JURISDICTION AND VENUE

13. This class action is brought pursuant to Federal Rule of Civil Procedure 23.

14. Venue is proper in the United States District Court for the Northern District of California, in that Defendant's headquarters are located in Palo Alto California in the Northern District of California.

15. There is original federal subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005, Pub. L. 109-2, 119 Stat. 4 (Feb. 18, 2005), by virtue of 28 U.S.C. §1332(d)(2), which explicitly provides for the original jurisdiction of federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from the State of citizenship of any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interests and costs.

16. In the case at bar, there are at least 100 members in the proposed Class, the total claims of the proposed Class members are in excess of $5,000,000.00 in the aggregate, exclusive of interests and costs, and Plaintiff and the class are citizens throughout various States across the United States.

17. Additionally, the Court has original federal subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 because it arises, at least in part, out of a question of federal law, in particular the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*.

**THE PARTIES**

18.    Plaintiff is a citizen and resident of Jacksonville, Florida.

19.    Defendant HP, INC. is a Delaware corporation with its principal place of business and state of incorporation in California.  Defendant conducts a large share of its business within California and in this judicial district.

20.    Plaintiff is informed and believes, and thereon alleges, that each and all of the acts and omissions alleged herein were performed by, or is attributable to, Defendant and/or its employees, agents, and/or third parties acting on its behalf, each acting as the agent for the other, with legal authority to act on the other's behalf.  The acts of any and all of Defendant's employees, agents, and/or third parties acting on its behalf, were in accordance with, and represent, the official policy of Defendant.

21.    Plaintiff is informed and believes, and thereon alleges, that Defendant is intentionally, negligently, or otherwise responsible for the acts, omissions, occurrences, and transactions of each and all its employees, agents, and/or third parties acting on its behalf, in proximately causing the damages herein alleged.

22.    At all relevant times, Defendant ratified each and every act or omission complained of herein.  At all relevant times, Defendant, aided and abetted the acts and omissions as alleged herein.

**PLAINTIFF'S FACTS**

23.    On or about September 12, 2017, Plaintiff purchased an HP Officejet Pro 7740 printer from an Office Depot located at 5914 Ramona Blvd. Jacksonville, Florida.

24.    On June 6, 2018, Plaintiff purchased another HP Officejet Pro 7740 printer online at Amazon.com.

25.    In purchasing the printers, Plaintiff paid more than valuable

1  consideration. Including taxes and fees, Plaintiff paid $213.99 for each printer.

2      26.    When shopping for a printer, Plaintiff was looking for a printer that
3  had the most features including the ability to use 952-, 952XL-, 953-, and
4  953XL- series ink cartridges.

5      27.    Nowhere at the time of purchase for either printer did Plaintiff see
6  any representations by Defendant that Plaintiff would only be able to use HP
7  brand ink-cartridges.  The only statement on the packaging stated "Please use
8  genuine HP ink cartridges for best results."  This statement did not make
9  Plaintiff believe that he would be able <u>only</u> to use HP brand ink, and in fact gave
10 the opposite impression to reasonable consumers and to Plaintiff – that HP ink
11 would give the *best* results, but not the *exclusive* results

12     28.    Plaintiff was aware that ink cartridges contributed to a significant
13 cost of the printer over its lifetime at the time of purchase. As a result, the ability
14 to use third party ink cartridges was one of the most significant features of the
15 printer that Plaintiff was seeking when examining the features of the printers and
16 determining which printer to purchase. In fact, Plaintiff did not purchase other
17 printers, such as a Lexmark brand printer, in favor of the HP Officejet Pro 7740
18 because of his belief that he could use third party ink cartridges. Had Plaintiff
19 known that he would be unable to use third party ink cartridges, Plaintiff would
20 have purchased a different printer.

21     29.    Plaintiff began using the printer with the preinstalled HP ink
22 cartridge.

23     30.    Over the life of the printer, Plaintiff used both HP ink cartridges and
24 third party ink cartridges.

25     31.    On or about April 12, 2019, HP forced a firmware update onto
26 Plaintiff's 7740 printers. From that day forward, Plaintiff could not get third
27 party ink cartridges or refilled HP ink cartridges to work and was instead greeted

28

with an error message. When Plaintiff tried to use his HP Officejet Pro 7740 to make black and white copies, the printer would not operate until Plaintiff ensured that every color ink cartridge was a new HP brand ink cartridge.

32.    In April 2019, HP implemented widespread firmware updates using the Dynamic Security technology, to push firmware onto consumers' HP printers, including Plaintiff's printers, without conspicuous advanced notice or authorization in order to disable the ability of such users to utilize third party and/or refilled ink cartridges.

33.    The result of the firmware push was that HP caused expense to Plaintiff and other similarly situated users through the following means: 1) rendering existing pre-purchased third party ink cartridges and refill cartridges useless and valueless; 2) forcing users to purchase significantly more expensive ink cartridges of HP brand in order for the cartridges to function in their printers; and 3) devaluing the HP printers of users, by invading and revising the internal firmware and software of the product such that its functionality was more limited and of less value to users and prospective users.

34.    For instance, Plaintiff had purchased and was in possession of at least nine refilled HP 952XL Black cartridges at the time that the firmware update was implemented, which were rendered useless and valueless to Plaintiff as a result of HP's unannounced firmware update.  Had Plaintiff known that HP could or would do this at its sole unannounced discretion at the time of purchase, Plaintiff would have bought a different brand of product.

35.    Plaintiff was given no disclosures on the box or sales page at the time of purchase that HP would or could lock out customers from using refill or replacement third party ink cartridges.

36.    Unbeknownst to Plaintiff or other HP customers, since HP never advises its customers of this feature, HP's wi-fi enabled printers come pre-

configured to perform automatic firmware updates without user intervention, meaning that by default, they are activated to install firmware updates from HP without user intervention.[2]

37.    At the time of purchase for either of his printers, Plaintiff did not visit or otherwise rely on any information contained within support.hp.com.

38.    Instead, Plaintiff relied on the same information a reasonable consumer would have used in deciding to make the purchase—the information contained on the box and store page for the printers.

39.    Regarding the error messages Plaintiff received, these too were highly misleading to Plaintiff and to a reasonable consumer.

40.    Upon installing a refilled ink cartridge, Plaintiff was given notification of the following message on his computer:

---

[2] In his First Amended Complaint, Plaintiff cited to HP's Support page for Plaintiff's model of printer to explain how HP's dynamic security function works to permit HP to unilaterally invade consumers' printers and force updates and how the text for the specific update used demonstrated how HP's statements regarding the dynamic security update and its effect on printers was itself inaccurate.  As stated in paragraph 37, Plaintiff did not view the support page prior to purchasing either of his printers and did not rely on the statements therein.

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15   41.   Plaintiff then received the following error message that was
16 displayed, informing him that his printer cartridge could not print without
17 replacing the empty cartridge, which suggested to Plaintiff that even though he
18 had inserted a full refilled ink cartridge, that his printer believed that he had
19 inserted an empty cartridge.  The error message did not notify Plaintiff that his
20 ink cartridge had been rendered incompatible with his printer due to HP's
21 firmware update.
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



42.    When Plaintiff attempted to bypass this error message by hiding the error message, he was given another misleading error message, an example of which is shown as follows:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



43.    Plaintiff attempted to get his printer to work with non-HP brand ink cartridges as well, in case the firmware update only affected refilled ink cartridges.  When Plaintiff attempted to use third party ink cartridges with his printers he was shown the following error message:



44.   Upon learning this, Plaintiff felt ripped off, cheated, and violated by Defendant.

45.   Plaintiff never authorized Defendant to force this modification on him in any way nor at any time.

46.   Defendant manufactured, sold, and modified Plaintiff's printer.

47.   Such business tactics rely on falsities, deception and force against a reasonable Purchaser.

48.   When purchasing the printer, Plaintiff anticipated using both Original HP-manufactured ink cartridges and third party ink cartridges based off the representations on the box which implied that third party cartridges would work with the printers, but soon discovered (a) Original HP-manufactured ink cartridges were considerably more expensive than third party cartridges; (b) third party ink cartridges produced printed matter as good as or better than Original HP-manufactured ink cartridges; and (c) third party ink cartridges appeared to

last longer and produce more pages per cartridge than Original HP-manufactured ink cartridges.

49.    Plaintiff was under the impression that when purchasing the printer, Plaintiff would be able to use third party ink cartridges and refilled HP ink cartridges. When Plaintiff purchased the printer, almost every printer allowed the use of third party ink cartridges and refilled name brand cartridges and HP's box use of the term "best results" instead of "only results" indicated that such cartridges would be used, so Plaintiff reasonably believed that he would be able to use Original HP-manufactured ink cartridges, third party remanufactured ink cartridges compatible with his HP Officejet Pro 7740, and refilled HP ink cartridges (whether refilled by the Plaintiff or by third parties). In fact, once the HP Officejet Pro 7740 printers were installed, Plaintiff confirmed his pre-purchase assumptions by successfully using a variety of compatible cartridge offerings. Defendant had made a material representation to this effect by omitting the crucial fact that Defendant had intended to prevent Plaintiff's use of a third party ink cartridge or a refilled HP ink cartridge in order to obtain a substantial profit from Plaintiff.

50.    Plaintiff was harmed by this because if the firmware was present at the time that he brought the printer home from the store, he would have been able to immediately return the product to the store for a return.  However, since it was sprung on Plaintiff years later, Defendant had implemented a ticking time bomb in its printers to be set off at a later date, at a time where Plaintiff and other similarly situated consumers had no recourse but to either succumb to HP's conduct and pay the inflated price of HP brand printer cartridges, or discard his two printers and purchase printers of a different brand.   The elements of infiltration and surprise by HP were significantly harmful to Plaintiff and others.

51.    It was Plaintiff's understanding at the time of purchasing the printer

that ink cartridges represent a large amount of the cost associated with the printers.

52.    Plaintiff was also of the understanding that third party ink cartridges and refilled brand name cartridges are often much cheaper than new HP brand ink cartridges.

53.    Plaintiff relied on Defendant's representations and omissions that Plaintiff would be able to purchase and use third party ink cartridges or refilled brand name cartridges with his printers.

54.    Plaintiff alleges that such representations and forced modifications were part of a common scheme to mislead Purchasers, invade their privacy rights and obtain an unfair competitive advantage against its business rivals in the current marketplace.

55.    Not only were such representations clearly misleading because the printer was infiltrated and altered through the course of his use, but the forced modification completely robbed Plaintiff of any use of third party ink cartridges or refilled HP ink cartridges that he had already purchased, rendering them of zero value. In addition, the firmware update disabled all or most of Plaintiff's HP printers' functionality, refusing to function until Plaintiff purchased and installed Original HP-manufactured ink cartridges, which significantly devalued the products, equivalent to HP having broken into Plaintiff's home in the dark of night and taken a blunt instrument to his printers.

56.    Plaintiff would not have purchased the printers if he knew that Defendant would forcibly control and modify his printers to reject third party ink cartridges, or if Defendant had not intentionally withheld this important and relevant information from his purchasing decision.

57.    Defendant benefited from falsely advertising the features and functions of the printer and from forcing unwanted and destructive modifications

on Plaintiff's and similarly situated Purchasers' Printers. Defendant benefited from the loss it caused to Plaintiff and provided nothing of benefit to Plaintiff in exchange.

58.     Defendant's unilateral and invasive decision to force the dynamic security firmware update on Class Printers does nothing to improve consumers experiences.  Prior to the update, Plaintiff and Class Members' printers used and worked successfully with and had quality printing from third party and refilled ink cartridges for which Plaintiff and Class Members had a significant benefit due to the lower cost of said ink cartridges.

59.     Defendant's decision to force the dynamic security feature through a firmware update on Class Printers specifically does not provide any countervailing benefits to consumers. The dynamic security features only effect is to restrict the ability for Plaintiff and Class Members to have choice in the ink cartridges they use with their printers.  Such restriction does not create any benefit for consumers, because the consumers already had quality printing at a lower price from the use of third party and refilled cartridges.  The effect of this dynamic security is to, at best, cause the consumers to experience the same quality of printing as consumers had previously while removing the ability to use third party and refilled ink cartridges and thus cost consumer significantly more money.

60.     Thus, there is no countervailing benefit for consumers from this feature to offset the harm caused by forcing consumers to purchase more expensive ink cartridges and for consumers to have sunk costs as a result of their already purchased third party and refilled ink cartridges becoming worthless.

61.     Further, there is no way that Plaintiff could have reasonably avoided the alleged injury.  As noted above, Plaintiff and the Class relied on the statements contained on the box and store page to indicate that the printers could

be used with third party and refilled ink cartridges.  Because Defendant failed to disclose information which would correct the omission that it would break the ability for the printers to use third party or refilled ink cartridges and Plaintiff and the Class reasonably relied on the statements Defendant did make, Plaintiff could not have reasonably anticipated Defendant's decision to force the dynamic security update on the printers and reduce their functionality and value.  Such inability is exemplified by the fact that Plaintiff had purchased and now holds nine generic cartridges which are now worthless as a result of Defendant's unilateral, invasive, and destruction dynamic security firmware update.

## COMMON FACTUAL ALLEGATIONS

62.     HP sells computers, printers and printer services.  Printers and printer ink account for nearly half of HP's business.

63.     HP obtains little or no profits from its printer sales.

64.     HP obtains substantial profits from its sales of printer ink cartridges.

65.     In HP's printer business, HP obtains most of its profits from selling ink cartridges used in HP printers.

66.     These ink cartridges are generally priced at $20 to $99 per ounce ($2,618 to $12,608 per gallon). The cost of ink cartridges often amounts to a substantial portion of the total cost of the printer housing the cartridges.

67.     Competing manufacturers sell printer ink cartridges that are compatible with HP printers and are priced well below the corresponding HP cartridges. To save money, HP printer owners often buy non-HP cartridges.

68.     Microchip technology allows HP to detect whether HP printers are using HP or non-HP cartridges.

69.     Because the Class Printers connect to the Internet, HP can communicate with HP printers after it sells them. One way to communicate with printers is by updating their software.

SECOND AMENDED CLASS ACTION COMPLAINT

**The Class Printers**

70.     Plaintiff is informed, believes, and based thereon alleges that Defendant engaged in the exact same practices with respect to all the HP Officejet Pro 7740 model printers like the one that Plaintiff purchased, as well as an extensive list of other similarly-effected printer models.  Hereafter, the following model printers shall be collectively referred to as "Class Printers:"

    a.  HP Officejet Pro 7720 All-in-One Printer;

    b.  HP Officejet Pro 7730 All-in-One Printer;

    c.  HP Officejet Pro 7740 All-in-One Printer;

    d.  HP Officejet Pro 8210 All-in-One Printer;

    e.  HP Officejet Pro 8216 All-in-One Printer;

    f.  HP Officejet Pro 8218 All-in-One Printer;

    g.  HP Officejet Pro 8700 All-in-One Printer;

    h.  HP Officejet Pro 8710 All-in-One Printer;

    i.  HP Officejet Pro 8714 All-in-One Printer;

    j.  HP Officejet Pro 8715 All-in-One Printer;

    k.  HP Officejet Pro 8716 All-in-One Printer;

    l.  HP Officejet Pro 8717 All-in-One Printer;

    m. HP Officejet Pro 8718 All-in-One Printer;

    n.  HP Officejet Pro 8719 All-in-One Printer;

    o.  HP Officejet Pro 8720 All-in-One Printer;

    p.  HP Officejet Pro 8724 All-in-One Printer;

    q.  HP Officejet Pro 8725 All-in-One Printer;

    r.  HP Officejet Pro 8726 All-in-One Printer;

    s.  HP Officejet Pro 8727 All-in-One Printer;

    t.  HP Officejet Pro 8728 All-in-One Printer;

    u.  HP Officejet Pro 8730 All-in-One Printer;

v.  HP Officejet Pro 8732M All-in-One Printer;

w. HP Officejet Pro 8734 All-in-One Printer;

x.  HP Officejet Pro 8735 All-in-One Printer;

y.  HP Officejet Pro 8736 All-in-One Printer;

z.  HP Officejet Pro 8740 All-in-One Printer;

aa. HP Officejet Pro 8743 All-in-One Printer;

bb. HP Officejet Pro 8744 All-in-One Printer;

cc. HP Officejet Pro 8745 All-in-One Printer;

dd. HP Officejet Pro 8746 All-in-One Printer;

ee. HP Officejet Pro 8747 All-in-One Printer;

ff. HP Officejet 7740 All-in-One Printer;

gg. HP Officejet 8702 All-in-One Printer;

hh. HP Officejet 8715 All-in-One Printer.

71.     With respect to all Class Printers, HP implemented and utilized the same Dynamic Security technology in the same or similar fashion as with respect to Plaintiff, in order to deactivate all Class Printers from having the ability to function with third party or refill ink cartridges.  This is the core conduct that is at the heart of Plaintiff's case, and the conduct occurred with respect to all Class Printers in a nearly identical fashion.

72.     People typically use Class Printers in homes or small offices.

73.     The Class Printers rely on ink cartridges for the ink with which they print documents.

74.     HP obtains a significant portion of its printer ink revenue from sales of replacement ink cartridges for the Class Printers.

75.     When it sold the Class Printers, HP made the same or similar misrepresentations and omissions with respect to each Class Printer.

76.     HP made the same or similar misrepresentations and omissions with

respect to each Class Printer, when it eliminated Class Printers' compatibility with third-party ink cartridges.

77.    In the same or similar manner, HP's firmware update disabled all Class Printers' ability to function with third-party ink cartridges.

### HP's Motives for Carrying Out Its Injurious Firmware Update

78.    HP printers and compatible ink cartridges contain chips that allow the printer and ink cartridge to communicate with each other. During these communications, through the use of key codes, the printer authenticates that the cartridge is compatible with it. The printer chip contains a master key code; the cartridge chip contains a base key code that is derived from the master code.

79.    HP has sought to enforce its alleged intellectual property rights associated with ink cartridges against alleged infringers. Whether attempting its enforcement under trade secret law or patent law, HP has generally been unsuccessful.

80.    In the Northern District of California, HP brought and voluntarily dismissed a lawsuit against Datel for allegedly misappropriating trade secrets concerning key codes. *Hewlett-Packard Co. v. Datel Holdings Ltd.*, No. 14-cv-02891-EJD (N.D. Cal. filed June 23, 2014) (voluntarily dismissed on Feb. 6, 2015). HP also brought—and voluntarily dismissed—a suit against Ninestar and Apex for making ink cartridge chips that allegedly infringed three HP patents. *Hewlett-Packard Co. v. Ninestar*, No. 14-cv-04473-HSG (N.D. Cal. filed Oct. 6, 2014) (voluntarily dismissed on May 6, 2015).

81.    HP's IP enforcement efforts in Europe have been similarly unsuccessful. In late 2015, HP lost a patent suit in the Netherlands against Digital Revolution, a Dutch maker of third-party ink cartridges that HP unsuccessfully claimed infringed a European ink cartridge chip patent similar to the patents at issue in the *Ninestar* case. *Hewlett-Packard Co. v. Digital*

*Revolution BV* [d.b.a. 123inkt], Case No. C/09/483615 / HA ZA 15-245, The Hague (Netherlands) (decided Nov. 25, 2015).

82.   According to its annual reports and other SEC statements, HP's revenues from sales of printer ink have declined in each year since at least 2013. In its 10-Q statement filed with the SEC for the third quarter of 2016, HP reported an 18 percent decline in year-over-year revenue from sales of printer ink.

83.   HP was therefore motivated to boost its earnings from sales of ink cartridges by directly disabling printers and ink cartridges and by conditioning the continued use of HP printers on purchases of its own cartridges.

### HP's Injurious Firmware Update

84.   In April 2019, thousands of Class Printers throughout the United States failed.

85.   These failures did not result from any problem or error with the ink cartridges in the Class Printers. Despite HP's error message, these ink cartridges were neither incorrectly installed, depleted, nor damaged.

86.   HP's firmware update changed the communication protocol between HP printers and microchips located in both HP-branded ink cartridges and third-party cartridges so that certain varieties of third-party inkjet cartridge microchips, were no longer able to communicate with the HP printer firmware. Because the firmware update blocked these remanufactured ink cartridge chips, any cartridge with such a chip no longer functioned with an HP printer.

87.   Failed Class Printers still don't work, except where they have been loaded with original replacement ink cartridges manufactured by HP.

88.   This is not the first time HP has engaged in this type of conduct. In or around March 2016, HP implemented a firmware update that similarly altered the communication protocol between HP printers and ink cartridges. That

firmware update targeted microchips manufactured by Static Control Components, and prevented remanufactured inkjet cartridges using such technology from working with HP printers.  HP ran another campaign of firmware updates in September 2017, which were highly publicized and subject to a class action and eventual injunctive relief judgment. [3]

89.    HP engaged in similar conduct with a separate firmware update in or around 2015, which targeted other technologies used in the inkjet marketplace by third-party remanufacturers of ink cartridges and ink refills.

90.    HP's pattern of pushing firmware updates upon consumers has disrupted the marketplace in the inkjet cartridge and refill market, by systematically disabling technology lawfully reengineered by third-party ink cartridge makers who sell their products in the same market as HP. These firmware updates rendered third-party ink cartridges obsolete with the click of a button. These updates harmed competition and caused consumers to pay more for HP products.

91.    HP purposely caused Class Printers with non-HP ink cartridges to

---

[3] *E.g.*, *HP Launched Delayed DRM Time Bomb to Disable Competing Printer                                                     Cartridges*, https://www.techdirt.com/articles/20160920/07021035568/hp-launched-delayed-drm-time-bomb-to-disable-competing-printer-cartridges.shtml (last visited Mar. 16, 2017); *EFF calls on HP to disable printer self-destruct sequence*, http://arstechnica.com/information-technology/2016/09/hp-should-apologize-and-stop-sabotaging-non-hp-ink-cartridges-eff-says/ (last visited Mar. 16, 2017); *Dedicated to the best printing experience*, http://www8.hp.com/us/en/hp-news/blog/Small-Business-Printing/best-possible-printing-experience.html?source=aw&aid=7168&jumpid=af_6mrc7uxaeb&awc=7168_1475273723_78f4d01e0844c1ceeab6b6cee5a4b2d7&aoid=35252&pbid=291795&siteid=http%3A%2F%2Fwww%2Edigitaltrends%2Ecom%2F (last visited Mar. 16, 2017).

fail.

92.    The failure of Class Printers on the same day resulted from malicious code that HP wrote and installed.

93.    Through its firmware update, HP sought to repel competition from more affordable ink cartridges on the market. The purpose of HP's update was to disable HP printers containing non-HP ink cartridges. By doing so, HP sought to induce more consumers to buy HP's higher-priced cartridges and to reduce the market share of its ink cartridge competitors.

94.    HP carried out this scheme to restrict the choices available to its customers, induce them to purchase more HP products, and protect HP's profits from sales of non-HP products.

## RISK OF CONTINUED CONDUCT AND NEED FOR INJUNCTION

95.    HP has been engaged in an anticompetitive scheme to monopolize the market, to the detriment of HP customers, for years across all inkjet printer lines, through a facially unlawful and unfair scheme substantially similar to the conduct described in this case.

96.    In September 2017, numerous consumers filed suit in a series of cases which were consolidated before this Court entitled *IN RE HP PRINTER FIRMWARE UPDATE LITIGATION*, Case No. 5:16-cv-05820-EJD.    The litigation involved claims brought on behalf of purchasers of Tier One Printers,[4] whose printers were subjected to a firmware update which rendered the printers incompatible with third party ink cartridges.  The litigation sought both monetary

_____

[4] Tier One Printers included the following models of printers: HP OfficeJet Pro 6230, 6812, 6815, 6820, 6830, 6835, 8610, 8615, 8616, 8620, 8625, 8630, X551dw, X451dn, X451dw, X576dw, X476dn, and X476dw.  The class period was defined as all consumers who purchased Tier One printers between March 1, 2015 through December 31, 2017.  Details of the settlement can be reviewed at Dkt. No. 118 of *IN RE HP PRINTER FIRMWARE UPDATE LITIGATION*.

relief and injunctive relief on behalf of HP customers for nearly identical conduct as is alleged in the present action, as can be seen from the complaint in that action at Dkt. No. 60.

97.   After years of litigation, including after plaintiffs filed their consolidated motion for class certification, the parties were able to resolve the matter on a class-wide basis which included both monetary relief and injunctive relief pertaining to HP's use of the Dynamic Security technology to push firmware updates onto users' printers which deactivated the printers when used with certain third party ink cartridges.  "Under the Settlement, HP agrees not to reinstall or reactivate Dynamic Security in the printers at issue in this litigation." Dkt. No. 110 at Pg. 6.

98.   Despite having used Dynamic Security technology for years to push firmware updates onto its customers' printers, to their detriment and to HP's benefit, and despite having entered into a stipulated nationwide injunction by which HP agreed to no longer conduct business in this manner, at least with respect to certain printer models, HP continues to use either the same or substantively similar technology to push firmware updates on its customers for other similar Tier two models of printers that were not specifically subject to the settlement in the prior litigation.

99.   HP is aware that customers have brought successful litigation against it for nearly identical conduct in the past, and knows that it was required to agree to enter into a stipulated class settlement agreement which, in part, enjoined future similar conduct on HP's part, yet nonetheless continues to engage in nearly identical conduct with respect to its customers, as evidenced by the experiences of Plaintiff and class members.

100.   It is clear from these circumstances that there is a substantial risk of future harm to Plaintiff, to putative class members, and to competition generally

if HP is not enjoined from such future behavior by order of court.

## CLASS ACTION ALLEGATIONS

101.   Plaintiff brings this action, on behalf of himself and all others similarly situated, and thus, seeks class certification under Federal Rule of Civil Procedure 23.

102.   The class Plaintiff seeks to represent a Class (the "Class") and Subclass ("the Subclass") is defined as follows:

> All United States Citizens who, between the applicable statute of limitations and the present, purchased or owned one of more Class Printers.

### The Florida Subclass

> All persons in Florida who purchased or owned one or more Class Printers.

103.   As used herein, the term "Class Members" shall mean and refer to the members of the Class described above.

104.   Excluded from the Class are Defendant, its affiliates, employees, agents, and attorneys, and the Court.

105.   Plaintiff reserves the right to amend the Class, and to add additional subclasses, if discovery and further investigation reveals such action is warranted.

106.   Upon information and belief, the proposed class is composed of thousands of persons.  The members of the class are so numerous that joinder of all members would be unfeasible and impractical.

107.   No violations alleged in this complaint are contingent on any individualized interaction of any kind between class members and Defendant.

108.   Rather, all claims in this matter arise from the identical and affirmative forced modifications.

109.   There are common questions of law and fact as to the Class Members that predominate over questions affecting only individual members,

including but not limited to:

    (a)    Whether Defendant engaged in unlawful or unfair business practices in forcibly modifying Plaintiff and other Class Members printers;

    (b)    Whether Defendant made misrepresentations with respect to the printers originally sold to Purchasers;

    (c)    Whether Defendant profited from both the initial sale and use of the printer and the forced modification;

    (d)    Whether Defendant violated F.S.A. §§ 501.201 *et seq.*;

    (e)    Whether Plaintiff and Class Members are entitled to equitable and/or injunctive relief;

    (f)    Whether Defendant's unlawful and/or unfair practices harmed Plaintiff and Class Members; and

    (g)    The method of calculation and extent of damages for Plaintiff and Class Members.

110.   Plaintiff is a member of the class he seeks to represent

111.   The claims of Plaintiff are not only typical of all class members, they are identical.

112.   All claims of Plaintiff and the class are based on the exact same legal theories.

113.   Plaintiff has no interest antagonistic to, or in conflict with, the class.

114.   Plaintiff is qualified to, and will, fairly and adequately protect the interests of each Class Member, because Plaintiff bought a printer from Defendant during the Class Period.  Defendant's unlawful and/or unfair actions concern the same business practices described herein irrespective of where they occurred or were experiences.  Plaintiff's claims are typical of all Class Members as demonstrated herein.

115.   Plaintiff will thoroughly and adequately protect the interests of the class, having retained qualified and competent legal counsel to represent himself and the class.

116.   Common questions will predominate, and there will be no unusual manageability issues.

## FIRST CAUSE OF ACTION

### Violation of the Florida Deceptive and Unfair Trade Practices Act

### (F.S.A §§ 501.201 *et seq.*)

### On Behalf of the Florida Subclass

117.   Plaintiff incorporates by reference each allegation set forth above.

118.   Pursuant to Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), §§ 501.201 *et seq.*, it is unlawful to engage in "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."[5]

119.   Defendant's conduct as alleged above violates the FDUTPA in that Defendant misled Purchasers by intentionally omitting highly relevant material information from purchasers at the point of sale regarding future restrictions that HP would place on the use of Class Printers, namely a firmware update that would render incompatible any third party or refill ink cartridges with Class Printers.

120.   Defendant's conduct as alleged above violates the FDUTPA in that Defendant invaded Class Members' Class Printers without notice or authorization and substantially decreased the value of the products, after the point of sale, by installing permanent firmware updates onto the units that rendered the units less functional and less valuable than they were prior to that

---

[5] For clarity, Plaintiff only alleges a claim that Defendant's conduct was unfair and thus unlawful, not that it was deceptive.

1    time.

2        121.   Defendant's conduct as alleged above violates the FDUTPA in that

3    Defendant   invaded   Class   Members'   Class   Printers   without   notice   or

4    authorization, and rendered existing third party and refill ink cartridges that

5    Class Members had previously purchased and owned valueless to class members

6        122.   Defendant's conduct as alleged above violates the FDUTPA in that

7    Defendant made Defendant sold printers which were not advertised to disclose

8    particular features and functions and forced modifications without consumers'

9    consent.

10        123.   Defendant's conduct as alleged above violates the FDUTPA in that

11    Defendant's conduct is harmful to competition and raises the cost of owning

12    printers  amongst  consumers  generally  in  the  marketplace  by  artificially

13    restricting  free  choice  with  respect  to  aftermarket  products.    This  is

14    accomplished by forcing existing customers who have sunk a high upfront cost

15    in a printer (a barrier to entry for a consumer who wishes to purchase a

16    competitor printer but is now stuck), and now are restricted to continuing to use

17    that printer and HP brand ink cartridges at an artificially elevated variable cost

18    due to barriers preventing them from altering their otherwise free choice.  By

19    tying a fixed base product (printers) to variable products (ink cartridges) in this

20    way, when combined with undisclosed deceptive conduct of altering the base

21    product without authorization, HP has harmed competition and consumers both

22    generally, and specifically.

23        124.   These  acts  are  unconscionable,  constitute  unfair  methods  of

24    competition and unfair trade practices as set forth under the FDUTPA, which

25    shall  be  "construed  liberally"  to  promote  policies  that  promote  consumer

26    protection.

27        125.   HP's conduct offends established public policy and is immoral,

28

unethical, oppressive, unscrupulous, and substantially injurious to consumers.

126.   Plaintiff, as a consumer of Defendant's products and being directly impacted by the conduct described herein suffered actual damages, and was injured by Defendant's conduct.

127.   Plaintiff relied on Defendant's material omissions and would never have purchased Defendant's products had he known that Defendant intended to implement firmware updates that would devalue his printers in the manner alleged herein.

128.   The unfair described herein presents a continuing threat to Plaintiff and the Class Members in that Defendant persists and continues to engage in these practices, and will not cease doing so unless and until forced to do so by this Court.   Defendant's conduct will continue to cause irreparable injury to Purchasers unless enjoined or restrained.   Plaintiff is entitled to preliminary and permanent injunctive relief ordering Defendant to cease their false advertising and forced modification of property, as well as disgorgement, actual damages and restitution to Plaintiff and all Class Members.

## SECOND CAUSE OF ACTION

### Violations of the Computer Fraud and Abuse Act,

### (18 U.S.C. § 1030, *et seq.*)

### (On Behalf of the Class)

129.   Plaintiff incorporates the above allegations by reference.

130.   The Consumer Fraud and Abuse Act ("CFAA") establishes a private cause of action against a person who "knowingly accessed a computer without authorization or exceeding authorized access," and whose prohibited access results in damage or loss in excess of $5,000. *See* 18 U.S.C. § 1030(g) (referencing § 1030(c)(4)(A)(i)(I)); *see also* § 1030(a).

131.   Specifically, the CFAA establishes liability against whomever:

a.    "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer" (§ 1030(a)(5)(A));

132.   The term "computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device[.]" 18 U.S.C. § 1030(e)(1).

133.   A "protected computer" is defined, in relevant part, as a computer "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B).

134.   "[E]xceeds authorized access" means "access[ing] a computer with authorization and … us[ing] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).

135.   "Loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

136.   Damage means "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).

137.   Class Printers are "computers" under the CFAA by virtue of their data processing and storage functionality and their operation in conjunction with Plaintiff's and Class members' laptop or desktop computers.

138.   Class Printers are "protected computers" under the CFAA because they are used in and affect interstate and foreign commerce and communication, including through contact and communication with remote servers and through

1    personal and business usages that affect interstate and foreign commerce.

2    139.   HP knowingly and intentionally exceeded its authorized access to

3    Plaintiff's and Class members' printers. Plaintiff and Class members did not

4    consent to HP's invasive firmware update.

5    140.   By exceeding its authorized access, HP obtained and altered Class

6    Printers' information and data. HP initiated printer-to-cartridge communications

7    that, through the use of key codes, prevented the ink cartridge from continuing to

8    work with the printer. These communications resulted from a single act in the

9    form of HP's activation of its firmware update.

10    141.   By implementing its firmware update, HP knowingly caused the

11    transmission of "a program, information, code, or command … to a protected

12    computer" and, as a result of that conduct, intentionally caused damage in

13    violation of 18 U.S.C. § 1030(a)(5)(A).

14    142.   HP's firmware implementation represented a single act through

15    which HP intentionally accessed Plaintiff's and Class members' protected

16    computers without authorization and by exceeding authorization. As a direct and

17    proximate result of HP's CFAA violations, HP caused damages and loss to

18    Plaintiff and Class members during a one-year period that exceed $5,000 in

19    value.

20    143.   HP's firmware implementation caused damage and loss to Plaintiff

21    and Class members—including by disabling Class Printers, eliminating or

22    impairing Plaintiff's and Class members' use of those printers, depriving

23    Plaintiff and Class members of the ability to use more affordable, non-HP

24    replacement cartridges in their Class Printers, causing Plaintiff and Class

25    members to expend money, time, and labor to investigate and try to fix their

26    disabled printers, and decreasing the value of the Class Printers.

27    144.   Based on HP's violation of the CFAA, Plaintiff and Class members

28

seek recovery of economic damages and all other relief provided for under 18 U.S.C. § 1030(g).

## THIRD CAUSE OF ACTION

### Trespass to Chattels

### (On Behalf of the Class)

145.   Plaintiff incorporates the above allegations by reference.

146.   Plaintiff and Class members owned, possessed, and used, and had a right to possess and use, their Class Printers and their non-HP ink cartridges designed to be used in these printers.

147.   HP wrongfully and intentionally interfered with Plaintiff's and Class members' ownership, possession, and use of their Class Printers and non-HP ink cartridges, by programming, distributing, and remotely activating a firmware update that disabled Class Printers containing non-HP ink cartridges and rendered those cartridges unusable.

148.   HP's wrongful and intentional interference with Plaintiff's and Class members' ownership, possession, and use of their Class Printers and non-HP ink cartridges caused damage to Plaintiff and Class members, including by preventing the Class Printers from operating, by impairing the condition of these printers, by reducing the value of these printers, and by depriving Plaintiff and Class members of the use of these printers and of their non-HP ink cartridges for a substantial period of time. A reasonable person would be willing to pay significantly less for a Class Printer, and for non-HP ink cartridges compatible with it, upon knowing that the printer contained or would be updated with firmware that would prevent the printer from operating with non-HP ink cartridges.

149.   Plaintiff and Class members are entitled to recover the amount by which HP's firmware update harmed their possessory interests in Class Printers

and non-HP ink cartridges.

## MISCELLANEOUS

150.   Plaintiff and Class Members allege that they have fully complied with all contractual and other legal obligations and fully complied with all conditions precedent to bringing this action or all such obligations or conditions are excused.

## REQUEST FOR JURY TRIAL

151.   Plaintiff requests a trial by jury as to all claims so triable.

## PRAYER FOR RELIEF

152.   Plaintiff, on behalf of himself and the Class and the Subclass, requests the following relief:

      (a)    An order certifying the Class and Subclass and appointing Plaintiff as Representative of the Class and Subclass;

      (b)    An order certifying the undersigned counsel as Class Counsel;

      (c)    An order requiring HP, INC., at its own cost, to notify all Class Members of the unlawful and unfair conduct herein;

      (d)    An order requiring HP, INC. to engage in corrective advertising regarding the conduct discussed above;

      (e)    An order entering injunctive and declaratory relief as appropriate under applicable law;

      (f)    Actual damages suffered by Plaintiff and Class Members and Subclass Members as applicable or full restitution of all funds acquired from Plaintiff and Class Members and Subclass Members from the sale of Class Printers during the relevant class period;

      (g)    Punitive damages, as allowable, in an amount determined by the Court or jury;

(h)   Any and all statutory enhanced damages;

(i)   All reasonable and necessary attorneys' fees and costs provided by statute, common law or the Court's inherent power;

(j)   Pre- and post-judgment interest; and

(k)   All other relief, general or special, legal and equitable, to which Plaintiff and Class Members and Subclass Members may be justly entitled as deemed by the Court.

Dated:  June 5, 2020                          Respectfully submitted,


By: /s Todd. M. Friedman
TODD M. FRIEDMAN, ESQ.
ADRIAN R. BACON, ESQ.

Attorneys for Plaintiff John Parziale

SECOND AMENDED CLASS ACTION COMPLAINT

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2020, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to all counsel of record registered in the CM/ECF system.

/s/ *Adrian R. Bacon*
Adrian R. Bacon